CRANDALL *against* THE STATE OF CONNECTICUT:

### IN ERROR.

An information for a violation of the statute of 1833, concerning the instruction of coloured persons not inhabitants of this State, is within the original jurisdiction of the superior court.

In an information on a penal statute, the prosecutor must set forth every fact

*Windham,*
July, 1834.

Crandall
*v.*
The State.

that is necessary to bring the case within such statute; and where there is an exception in the enacting clause, he must shew, that the defendant is not within it.

It is not a violation of the statute of 1833, concerning the instruction of coloured persons not inhabitants of this State, to harbour and board such coloured persons for the purpose of their attending a school licensed by the civil authority and select-men of the town.

Therefore, where an information on such statute charged the defendant with harbouring and boarding certain coloured persons not inhabitants of this State, for the purpose of their attending and being instructed in a school previously set up for the instruction of that class of persons, averring that the acts complained of were done without the license of the civil authority and select-men of the town, but not averring that the school was set up without license, or that the scholars were instructed by those who had no license ; it was held, that the want of such last-mentioned averment was a fatal defect, incurable by verdict.

*Qu.* Whether such statute be not unconstitutional and void, as contravening the 2nd section of the 4th article of the constitution of the *United States*, which secures to the citizens of each State all the privileges and immunities of citizens in the several States.

Where the plaintiff in error makes the general assignment, and then assigns particular causes of error, he will not be allowed to insist upon other particular causes under the general assignment.

But if the court, on inspection of the record, discover a fatal defect not specially assigned, it will be their duty to reverse the judgment.

THIS was an information, filed by the prosecuting attorney for the county of *Windham,* for a violation of the statute of 1833, regarding the instruction of coloured persons not inhabitants of this state.(*a*)   The information alleged, That at *Can-*

(*a*) The preamble and first section of that act, are in the following words :
" Whereas, attempts have been made to establish literary institutions in this state, for the instruction of coloured persons belonging to other states and countries, which would tend to the great increase of the coloured population of the state, and thereby to the injury of the people : Therefore,

" Sec. 1. *Be it enacted by the Senate and House of Representatives, in General Assembly convened,* That no person shall set up or establish in this state any school, academy, or literary institution, for the instruction or education of coloured persons, who are not inhabitants of this state, nor instruct or teach in any school, academy, or other literary institution whatever in this state,'or harbour or board, for the purpose of attending or being taught or instructed in any such school, academy, or literary institution, any coloured person who is not an inhabitant of any town in this state, without the consent, in writing, first obtained of a majority of the civil authority, and also of the select-men of the town in which such school, academy, or literary institution is situated ; and each and every person who shall knowingly do any act forbidden as aforesaid, or shall be aiding or assisting therein, shall, for the first offence, forfeit and pay to the treasurer of this state, a fine of one hundred

*terbury,* in said county, on the 24th of *September,* 1833, for the purpose of attending and being taught and instructed in a certain school, which before that time had been and then was set up, in said town of *Canterbury,* for the instruction and education of coloured persons, not inhabitants of this State, *Prudence Crandall,* of said *Canterbury,* with force and arms, wilfully and knowingly did harbour and board certain coloured persons, to wit, *Ann Eliza Hammond,* and others, whose names are to the attorney aforesaid unknown, and who, when so harboured and boarded, were not inhabitants of any town in this state ; all which acts and doings of the said *Prudence Crandall* were done and committed without the consent in writing first obtained of a majority of the civil authority and also of the select-men of said town of *Canterbury,* where said school was then situated ; against the peace of this state, and contrary to the form and effect of the statute law of this state in such case made and provided.

The defendant pleaded *Not guilty ;* and on this issue the cause was tried, at *Brooklyn, October term,* 1833, before *Daggett,* Ch. J.

The attorney for the state claimed to have proved, that the defendant had harboured and boarded divers coloured persons for the purpose of attending the school mentioned in the information ; and that such coloured persons were not inhabitants of this state, when so harboured and boarded, but that they belonged to the states of *Rhode-Island, Pennsylvania* and *New-York,* and were born in those states respectively, of coloured parents there belonging, and had continued to reside in the places of their birth until the *Spring* of the year 1833, when they came to *Canterbury* to attend said school, for the purpose of being instructed in the ordinary branches of school education. Upon these facts being proved, the attorney claimed, that the defendant had incurred the penalty provided by the

dollars, and for the second offence, shall forfeit and paya fine of two hundred dollars, and so double for every offence of which he or she shall be convicted. And all informing officers are required to make due presentment of all breaches of this act. *Provided,* That nothing in this act shall extend to any district school established in any school society under the laws of this state, or to any school established by any school society under the laws of this state, or to any incorporated aeademy or incorporated school for instruction in this state."

*Windham,*
*July, 1834.*

Crandall
*v.*
The State.

act; no claim being made that a license had been granted for the school. The defendant claimed, and prayed the court to instruct the jury, that if they should find these facts proved, such coloured persons were to be regarded as citizens of the states where they respectively belonged and were born; and that they were entitled to the privileges and immunities secured by the 2nd section of the 4th article of the constitution of the *United States ;* and that said statute, depriving them of the privilege of attending said school, for the purpose of acquiring useful knowledge, while the privilege of attending the same school for the same purpose, was allowed to coloured persons belonging to this state, and imposing a penalty for harbouring and boarding coloured persons not belonging to this state, while no such penalty was imposed for harbouring and boarding the coloured inhabitants of this state, was repugnant to the constitution of the *United States,* and void. The court instructed the jury as follows :

" This is an information filed by the attorney for the state, for an alleged violation of a statute law, passed by the General Assembly, at their last session, relating to inhabitants; the preamble to the act, embracing the reasons for the law.

" It is alleged in this information, that since the 22d day of *August* last, to wit, on the 24th day of *September,* 1833, the defendant has, wilfully and knowingly, harboured and boarded coloured persons not inhabitants of the state, for the purposes mentioned in said act, without having obtained in writing, the consent of the civil authority and select-men of the town of *Canterbury,* where the school had been set up. As to the facts in this case, there seems to be but little controversy. It has scarcely been denied, that coloured persons have been harboured and boarded, by the defendant, for the objects alleged, within the time set forth in this information. You, gentlemen of the jury, have heard the evidence, and as it is your exclusive business to pass upon these facts, you will say whether or not they are true.

" If these facts are not proved to your satisfaction, then you may dismiss the cause ; for in that event, you have no further duty to perform. If, however, you find the *facts* true, then another duty equally important, devolves upon the jury. It is an undeniable proposition, that the jury are judges of both law and fact, in all cases of this nature. It is, however, equal-

ly true, that the court is to state *its* opinion to the jury, upon all questions of law, arising in the trial of a criminal cause, and to submit to their consideration, both law and fact, without any direction how to find their verdict.

" The counsel for the defendant, have rested her defence upon a provision of the constitution of the *United States,* claiming that the statute law of this state, upon which this information is founded, is inconsistent with that provision, and, therefore, void. This is the great question involved in this case ; and it is about to be submitted to your consideration.

" It is admitted, that there are no provisions in the constitution of this state, which conflict with this act. It may be remarked here, that the constitution of the *United States,* is above all other law,—it is emphatically the supreme law of the land; and the judges are so to declare it. From the highest court to the lowest, even that of a justice of the peace, all laws, whether made by Congress or state legislatures, are subject to examination, and when brought to the test of the constitution, may be declared utterly void. But in order to do this, the court should first find the law contrary, and plainly contrary, to the constitution. Although this may be done, and done too, by the humblest court, yet it never should be done but upon a full conviction that the law in question is unconstitutional.

" Many things said upon this trial, may be laid out of the case. The consideration of slavery, with all its evils and degrading consequences, may be dismissed, with the consideration that it is a degrading evil. The benefits, blessings and advantages of instruction and education, may also cease to claim your attention, except you may well consider that education is a ' fundamental privilege,' for this is the basis of all free government.

" Having read this law, the question comes to us with peculiar force, does it clearly violate the constitution of the *United States ?* The section claimed to have been violated, reads as follows, to wit : *Art.* 4. *sec.* 2. ' The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.' It has been urged, that this section was made to direct, exclusively, the action of the general government, and therefore, can never be applied to state laws. This is not the opinion of the court. The plain and obvious meaning of this provision, is, to secure to the *citizens* of all the states, the same privileges as are secured to

our own, by our own state laws.   Should a citizen of *Connect-icut* purchase a farm in *Massachusetts*, and the legislature of *Massachusetts* tax the owner of that farm, four times as much as they would tax a citizen of *Massachusetts*, because the one resided in *Connecticut* and the other in *Massachusetts ;* or should a law be passed, by either of those states, that no citizen of the other, should reside or trade in that other, this would, undoubtedly, be an unconstitutional law, and should be so declared.

" The second section was provided as a substitute for the 4th article of the *Confederation.*   That article has also been read, and by comparing them, you can perceive the object intended by the substitute.

" The act in question provides, that coloured persons, who are not inhabitants of this State, shall not be harboured and boarded for the purposes therein mentioned, within this state, without the consent of the civil authority and select-men of the town. We are, then, brought to the great question, are they *citizens* within the provisions of this section of the constitution ?   The law extends to all persons of colour not inhabitants of this state, whether they live in the state of *New- York*, or in the *West-Indies,* or in any other foreign country.

" In deciding this question, I am happy that my opinion can be revised, by the supreme court of this state and of the *United States*, should you return a verdict against the defendant.

" The persons contemplated in this act are *not citizens* within the obvious meaning of that section of the constitution of the *United States*, which I have just read.   Let me begin, by putting this plain question.   Are *slaves* citizens ?   At the adoption of the constitution of the *United States*, every state was a slave state.   *Massachusetts* had begun the work of emancipation within her own borders.   And *Connecticut*, as early as 1784, had also enacted laws making all those free at the age of 25, who might be born within the State, after that time.   We all know, that slavery is recognized in that constitution ; and it is the duty of this court to take that constitution as it is, for we have sworn to support it.   Although the term ' slavery' cannot be found written out in the constitution, yet no one can mistake the object of the 3d section of the 4th article : ' No person held to service or labour in one state, under the laws thereof, escaping into another, shall, in consequence of any law

or regulation therein, be discharged from such service or labour, but shall be delivered, upon claim of the party to whom such service or labour may be due.'

" The 2d section of the 1st article, reads as follows :—'Representatives and direct taxes, shall be apportioned among the several states which may be included in this Union, according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding *Indians* not taxed, three fifths of *all other persons.*' The ' other persons' are slaves, and they became the basis of representation, by adding them to the white population in that proportion. Then slaves were not considered citizens by the framers of the constitution. . . .

" A *citizen* means a *freeman.* By referring to Dr. *Webster*, one of the most learned men of this or any other country, we have the following definition of the term—' Citizen : 1. A native of a city, or an inhabitant who enjoys the freedom and privileges of the city in which he resides. 2. A townsman, a man of trade, not a gentleman. 3. An inhabitant; a dweller in any city, town or country. 5. In the *United States,* it means a person, native or naturalized, who has the privilege of exercising the elective franchise, and of purchasing and holding real estate.'

" Are *Indians* citizens ? It is admitted in the argument, that they are not; but it is said, they belong to distinct tribes. This cannot be true ; because all *Indians* do not belong to a tribe. It may be now added, that by the declared law of *New-York, Indians* are not citizens; and the learned Chancellor *Kent,* says 'they never can be made citizens.' *Indians* were literally natives of our soil ; they were born here ; and yet they are not citizens.

" The *Mohegans* were once a mighty tribe, powerful and valiant ; and who among us ever saw one of them performing military duty, or exercising, with the white men, the privilege of the elective franchise, or holding an office ? And what is the reason ? I answer, they are not citizens, according to the acceptation of the term in the *United States.*

" Are *free blacks,* citizens ? It has been ingeniously said, that vessels may be owned and navigated, by free blacks, and the *American* flag will protect them ; but you will remember, that the statute which makes that provision, is an act of Con-

*Windham,*
July, 1834.

Crandall
*v.*
The State.

gress, and not the constitution. Admit, if you please, that Mr. *Cuffee,* a respectable merchant, has owned vessels, and sailed them under the *American* flag ; yet this does not prove him to be such a citizen as the constitution contemplates. But that question stands undecided, by any legal tribunal within my knowledge. For the purposes of this case, it is not necessary to determine that question.

" It has been also urged, that as coloured persons may commit treason, they must be considered citizens. Every person born in the *United States,* as well as every person who may reside here, owes allegiance, of some sort, to the government, because the government affords him protection. Treason against this government, consists in levying war against the government of the *United States,* or aiding its enemy in time of war. Treason may be committed, by persons who are not entitled to the elective franchise. For if they reside under the protection of the government, it would be treason to levy war against that government, as much as if they were citizens.

" I think Chancellor *Kent,* whose authority it gives me pleasure to quote, determines this question, by fair implication. Had this authority considered free blacks citizens, he had an ample opportunity to say so. But what he has said excludes that idea : 'In most of the *United States,* there is a distinction in respect to political privileges, between free white persons and free coloured persons of *African* blood ; and in no part of the country do the latter, in point of fact, participate equally with the whites, in the exercise of civil and political rights. The *African* race are essentially a degraded caste, of inferior rank and condition in society. Marriages are forbidden between them and whites, in some of the states, and when not absolutely contrary to law, they are revolting, and regarded as an offence against public decorum. By the revised statutes of *Illinois,* published in 1829, marriages between whites and negroes, or mulattos, are declared void, and the persons so married are liable to be whipped, fined and imprisoned. By an old statute of *Massachusetts,* of 1705, such marriages were declared void, and are so still. A similar statute provision exists in *Virginia* and *North-Carolina.* Such connexions in *France* and *Germany,* constitute the degraded state of concubinage, which is known in the civil law. But they are not legal marriages,

because the parties want that equality of state or condition, which is essential to the contract.' 2 *Kent's Comm.* 258.

" I go further back still. When the constitution of the *United States* was adopted, every state, (*Massachusetts* excepted,) tolerated slavery. And in some of the states, down to a late period, severe laws have been kept in force regarding slaves. With respect to *New-York*, at that time, her laws and penalties were severe indeed; and it was not until *July* 4th, 1827, that this great state was ranked among the free states.

To my mind, it would be a perversion of terms, and the well known rule of construction, to say, that slaves, free blacks, or *Indians*, were citizens, within the meaning of that term, as used in the constitution. God forbid that I should add to the degradation of this race of men; but I am bound, by my duty, to say, they are not citizens.

" I have thus shown you that this law is not contrary to the 2d section of the 4th art. of the constitution of the *United States ;* for that embraces only citizens.

" But there is still another consideration. If they were citizens, I am not sure this law would then be unconstitutional. The legislature may *regulate schools.* I am free to say, that education is a fundamental privilege; but this law does not prohibit schools. It places them under the care of the civil authority and select-men; and why is not this a very suitable regulation ? I am not sure but the legislature might make a law like this, extending to the white inhabitants of other states, who are unquestionably citizens, placing all schools for them under suitable boards of examination, for the public good ; and I can see no objection to the board created by this act.

" What can the legislature of this state do ? It can make any law, which any legislature can make, unless it shall violate the constitution of the *United States,* or the constitution of its own state; and in my opinion, *this* law is not inconsistent with either.

" The jury have nothing to do with the popularity or unpopularity of this or any other law, which may come before them for adjudication. They have nothing to do with its policy or impolicy. Your only enquiry is, whether it is constitutional.

" I may say with truth, that there is no disposition in the judicial tribunals of this state, nor among the people, to nullify

*Windham,*
*July, 1834.*

*Crandall*
*v.*
*The State.*

the laws of the state, but if constitutional, to submit to them, and carry them into full effect, as good citizens. If individuals do not like the laws enacted by one legislature, their remedy is at the ballot boxes. It often occurs, on subjects of taxation, that laws are supposed, by some, to be unjust and oppressive. Nearly every session of the Assembly, attempts have been made to alter and change such laws ; but as long as they exist, they must have effect.

" You will now take this case into your consideration, and notwithstanding my opinion of the law, you will return your verdict according to law and evidence. I have done my duty, and you will do yours."

The jury returned a verdict against the defendant ; and she thereupon filed a motion in arrest of judgment, on two grounds; first, that the superior court had not jurisdiction of the offences charged ; and secondly, that the information was insufficient. The court overruled the motion and rendered judgment against the defendant to pay a fine of 100 dollars and costs. The defendant thereupon filed a bill of exceptions to the charge, and a motion in error, containing the following assignment of errors: " That the superior court, in the opinions expressed and intimations given to the jury in the cause, and in deciding that the superior court had jurisdiction of the same, and that said information and the matters therein contained were sufficient, manifestly erred and mistook the law ; for that the court should have informed the jury, that said coloured persons were to be regarded as citizens of the states to which they respectively belonged and of the *United States,* and were entitled to the privileges and immunities secured by the 4th article of the constitution of the *United States ;* and that said law of the state of *Connecticut* was repugnant to the constitution of the *United States* and void ; and said court should have decided, that it had no jurisdiction of the cause, and that said information was insufficient."

*Goddard* and *W. W. Ellsworth,* for the plaintiff in error, contended, That the act of the General Assembly, on which this prosecution is founded, is unconstitutional and void. In support of this proposition, they insisted,

1. That the coloured persons mentioned in the information, are *citizens* of their respective states. If they were white, it is

conceded they would be.  The point turns, then, upon a distinction in *colour* only.  This distinction, as the basis of fundamental rights, is, in the first place, novel.  It is not recognized, by the common law of *England,* or the principles of the *British* constitution ; by our own declaration of independence ; or by the constitution of *Connecticut.*

Secondly, it would be extremely inconvenient, if not impracticable, in its application.  Who can tell the proportions and trace the mixtures of blood ?   What shall be the scale for the ascertainment of citizenship ?   Shall one half, one quarter, one twentieth, or the least possible taint of negro blood, be sufficient to take from its possessor the citizen character ?

Thirdly, the persons in question are human beings, born in these states, and owe the *same obligation* to the state and to its government as white citizens.   In all the writers on public law there is one ancient and universal classification of the people of a country : all who are born within the jurisdiction of a state are natives, and all others are aliens.   This classification grows out of the doctrine of natural allegiance, a tie created by birth.   All writers agree in the foundation of allegiance, and in its obligations, while it exists ; some holding that it can never be thrown off, and some that it may be, under legislative enactments ; but all agreeing that while the residence of the citizen continues in the state of his birth, allegiance demands obedience from the citizen and protection from the government. Allegiance is not peculiar to any one government or country ; but it is held to exist in every country and every government where there are pretensions to social order and civil institutions. It reaches the man of one complexion as much as that of another :  it is the ordinance of the great Parent of all society, fairly inferrible from the nature and  necessity of  human government.   If allegiance is due from our coloured population, its correlative is due from the government, *viz.* protection and equal laws.   If allegiance is an ordinance of Heaven, it reaches, and binds, and confers rights upon every man within its range and rightful sway.   Here, the free man of colour may take his position, and upon the immutable principles of justice and truth demand his political rights from that government which he is bound to aid and to defend : *he is not a citizen to obey, and an alien to demand protection.*   Nor is he of an intermediate class.   His relations to society are the same as

HARVARD LAW LIBRARY

Windham,
July, 1834.
_____
Crandall
*v.*
The State.

others ; his absolute and relative rights, his rights of person and to things, his acquisitions of property by contract and by inheritance,—and even the soil, which no alien inherits—are the same.   So every requisition of the law, in its civil and criminal provisions, reaches him.   His legal capabilities and his legal obligations are the same.   Every favour or right conferred on the citizens, by general legislation, reaches *him ;* every requisition demands *his* obedience.   The doctrine of natural allegiance was recognized in *Talbot* v. *Janson,* 3 *Dal.* 133.   *The United States* v. *Williams,* in 1799, before *Ellsworth,* Ch. J. and *Law,* Dist. J. cited 2 *Cranch* 82. n.   *Murray* v. *The Charming Betsey,* 2 *Cranch* 64.   The case of *The Santissima Trinidad,* 7 *Wheat.* 283.   *Jackson* d. *Smith* v. *Goodell,* 20 *Johns. Rep.* 188.

Fourthly, there is nothing in the constitutions of the native states of these persons, or in the constitution of the *United States,* depriving them of fundamental rights on the ground of colour.   [Here the counsel went into an examination of all the provisions bearing on this subject in the constitution or charter of *Rhode-Island,* the constitutions of *Pennsylvania* and *New- York,* the articles of confederation, the constitution of the *United States* and the acts of Congress.]

Fifthly, by the free and excellent form of civil government, adopted by the people of this state, and secured by the charter of *Charles* II., as well as by the constitution of 1818, the privileges of the *habeas corpus* act, which, in *Great-Britain,* made coloured people *freemen,* are adopted and established as fundamental principles.   *Stat. Conn.* 5. 22. ed. 1808.   *Const. Conn. art.* 1. *sec.* 1. 5. 14. 16. 17. *art.* 6.

2. That as *citizens,* the constitution of the *United States* secures to the persons in question the right of residing in *Connecticut,* and pursuing the acquisition of knowledge, as people of colour may do, who are settled here.

In the first place, the language of the constitution (*art.* 4. *sec.* 2.) is *universal* and *unqualified :* it says, " *every citizen."*

Secondly, a citizen of another state may come here to *reside,* without being fined, or laid under any peculiar exactions.   He must have a right to do what our citizens may do, under like circumstances.

Thirdly, he may come here to be *educated.*   The right of education is a *fundamental* right.   It is the main pillar of our free institutions.   *Corfield* v. *Coryell*, 4 *Wash. C. C. Rep.* 380.   3 *Story's Com.* 674.   2 *Kent's Com.* 61.

*Windham,*
*July, 1834.*

Crandall
*v.*
The State.

The law under consideration forbids a citizen of another state to come here to pursue education, as all others may do, because he has not *a legal settlement in the state.*   It is a crime to feed him, to teach him or entertain him.

The principal objections against these positions, are, first, that men of colour cannot *vote* in *Connecticut ;* and therefore, they are not citizens of *Connecticut.*

The first answer to this objection is, that in *Pennsylvania* and *New-York,* (as well as in *Maine, New-Hampshire, Massachusetts, Vermont, New-Jersey, Delaware, Maryland, North-Carolina* and *Tennessee,*) they *can* vote; and if voting is the criterion of citizenship, they are citizens there.

But secondly, the right of voting is not the criterion of citizenship : the one has no natural or necessary connexion with the other.   Cases may exist where persons vote who are not citizens, and where persons are citizens and do not vote.   The right of suffrage is no where universal and absolute.   It is founded in notions of internal police, varying frequently, even in the same government; whereas citizenship grows out of allegiance, which is every where the same, and is unchanging. Persons sometimes vote for one branch of the government only, as was lately the case in *New-York.*   How much of a citizen was such a voter ?   Formerly, property was a necessary qualification in *Connecticut.*   Were none but persons of property citizens ?   Suppose a voter in *Connecticut* should lose his right of suffrage, by reason of criminal conduct, as by law he may do, does he cease to be a citizen ?   Does he become an *alien ?*   No female can vote, nor any minor ; but are not females and minors citizens ?

If voting makes a citizen, what confusion !   The same man, in one state, is a full citizen ; in another, half a citizen ; in another a non-descript ; in another, an alien.   How absurd to create such distinctions in these states !

Again, if voting is the criterion of citizenship, then every person who has been *naturalized,* has a right to vote ; for he is a citizen ; but every naturalized person has not of course a right to vote.   So the widow and children of a person, who

HARVARD LAW LIBRARY

*Windham,*
*July, 1834.*

*Crandall*
*v.*
*The State.*

dies after he has applied for naturalization, but before he has obtained it, are declared citizens ; but it is needless to say they cannot vote.

Another objection is, that *Indians* are not citizens ; and hence it is inferred, that these pupils are not. In the first place, these pupils are not *Indians.* But secondly, *Indians* have hitherto been treated as members of national tribes, in alliance with the *United States,* according to treaty stipulations and the intercourse law. They have been held to be without the *practical* jurisdiction of the states. But since Congress has withdrawn its ancient jurisdiction, and the states have extended theirs over these tribes, it is not certain what is the **exact** political character of an *Indian* born in these states. Even in *New-York,* before the late change in our *Indian* affairs, they were there decided to be *citizens,* by a unanimous opinion of the supreme court, on the ground of the state's having jurisdiction and the *Indians* owing allegiance. *Jackson* d. *Smith* v. *Goodell,* 20 *Johns. Rep.* 188. 191, 2, 3.

Again, it is objected, that slaves are not citizens. But these pupils are not slaves. The reason why slaves are not citizens, is, because they are held to be *property,* and not men, and hence have not freedom of choice or action. The reason does not reach these pupils.

It is further objected, that the legislature may, as it has often done, superintend and regulate schools ; and that the act in question is only an exercise of that power. The fact asserted here is not true. The power in question is not one of mere supervision and regulation, but it is a power of *exclusion* on the ground of alienage. Such it is in effect ; and so it was designed to be. As well might the legislature, in order to raise up a more beautiful or vigorous generation of citizens, prohibit the harbouring or entertaining of any citizen from the other states, who was not six feet high, or had not a well proportioned body, or black eyes, or a clear skin. If this power exists, the legislature may *regulate* every youth at *Yale-College,* being citizens of other states, out of our borders as *aliens.* If indeed this power exists, such persons can just as well be prohibited all *entrance* into the state, as to be removed, or *regulated* away, after they have come here.

The legislature may, undoubtedly, superintend public schools ; for they are instituted by the legislature, and sustained by pub-

lic money.   Nor is it doubted that the legislature may superintend and regulate private schools, as it does trades, professions, taverns, sales at auction, peddling, &c.   It may superintend and regulate *all* the pursuits of the citizens; but then this must be done, by a general and equal law.   Mere *birth* in another state cannot be seized upon as ground of distinction and consequent privation.   This is not consistent with the paramount authority of the constitution, that "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states."   Can our legislature say, that no man shall be a lawyer, or physician, or merchant, or mechanic here, who was born in *Massachusetts?*

But it is asked, may we not keep out of *Connecticut* paupers and vagabonds; and have not such laws been of long standing ? *Stat.* 281. 2. *tit.* 51. *s.* 6. 7. 8.   This ancient statute was enacted before the adoption of the articles of confederation, or the present constitution of the *United States,* when this state had a right to exclude the citizens of other states or colonies ; for they then stood in no other light than *aliens.*   But this law is now contrary to the constitution of the *United States,* and cannot be sustained.   If the 2nd section of the 4th article means any thing, it secures to a citizen of *New-York* a right to come here, and *remain* here, if he offends against no general law.   He cannot be whipped out, nor carried out, of the state, because he has no legal settlement.   He may present the shield of the constitution, and, as *Paul* claimed the immunity of a *Roman* citizen, he may claim the immunity of an *American* citizen.   The legislature may declare, that such an one shall not gain a legal settlement ; nor can it be forced to burden the public treasury with the support of a foreign citizen ; for the whole matter of settlement and of supporting paupers of any description, is of mere municipal regulation ; but it can go no further.   Neither the existence of present nor the apprehension of future poverty, can strike out of the constitution the word "citizen ;" and a citizen has a universal right, title and immunity to a *residence* and other fundamental rights.   So the state may guard itself against thieves from without or within, by punishing them for crimes committed in our territory, or by enacting *general* laws of prevention ; but it cannot prohibit a *citizen* of the *United States* from entering this

*Windham,*
July, 1834.

Crandall
*v.*
The State.

state and remaining in it, because he has offended elsewhere, or may offend again.

*Judson* and *C. F. Cleaveland*, for the state, (defendant in error,) after remarking upon the magnitude of the question, as affecting not the town of *Canterbury* alone, but every town in the state and every state in the *Union*; as the principles urged by the counsel for the plaintiff in error, if established, would, in their consequences, destroy the government itself and this *American* nation—blotting out this nation of white men and substituting one from the *African* race—thus involving the honour of the state, the dignity of the people and the preservation of its name—contended,

1. That the state does possess the power to regulate its own schools, and pursue its own systems of education, in its own chosen way, independently of the question of citizenship. The matter of *education* was never given up to the general government; because the structure, object, and end of that government were of a different character. The government has never attempted any controul over *education*, in any one state in the Union, but only in the district of *Columbia*. The state governments have uninterruptedly exercised this power; and their capacity to do so will be found much more congenial, than that of the general government. We ought to be satisfied that the state sovereignties maintain their internal police— their domestic arrangements, while the general government moves on in its elevated sphere of action.

It has ever been the policy of this state, to regulate all its *schools, academies,* and *colleges,* and subject them to a strict *visitorial power.* The seeds of morality and virtue are first sown in our schools, and if neglected, the seeds of vice and immorality soon spring up, and would undermine all that we hold dear, even the government itself. If in *Connecticut* we have any renown, it is because our fathers have watched over the education of youth with becoming solicitude. As early as the year 1717, a statute was passed, by the General Assembly, establishing a *Board of Visitors*, such as this act contemplates. *Stat.* 213, 4. ed. 1750.

This law continued in force until 1795, when the present system was adopted, and a *new board* was instituted, less burthensome to the people. The law in question goes back to the

early policy of the state, and takes the civil authority and se-
lect-men, as the proper board under this act. Every *college,*
and every incorporated academy in this state, have established
a board of visitors; and this is not deemed a violation of the
constitution. It is essential to good order, and the prosperity of
these institutions, that it should be so. It may be presumed,
that every state in the Union has exercised the same unques-
tionable power.

*Windham,*
July, 1834.

Crandall
*v.*
State.

The late President *Dwight,* in his *travels,* has taken pains
to collect the laws of *Massachusetts,* on this subject; and by
these laws, it will be seen, that it has equally been the policy
of that state to put all her schools, both *public* and *private,*
under the superintendence of the *select-men ;* and they go so
far as not to allow any but *citizens* to instruct their schools.

" If a person who is not a *citizen,* shall keep a school in the
commonwealth for one month, he shall be subjected to a fine
of 20*l.*"

The legislature of *Massachusetts* became the guardians of
all schools, that such schools may teach the " principles of pie-
ty, justice, and *love of country.*"

These are objects worthy to be guarded, and are no less so
now, than when Dr. *Dwight* wrote, or when the legislature
of *Massachusetts* enacted the laws he has enumerated. This
" love of country" ought to remind us, that the states have a
great work to do, in regulating and superintending their
schools; and as it has never been surrendered under the consti-
tution, we should not, for the mere purpose of indulging the
visionary fanatic, now construe it away.

It is incident to all these literary corporations, that students
may be admitted or excluded at pleasure. Suppose the corpo-
ration of *Yale-College* should, by solemn vote, prohibit stu-
dents from *South-Carolina,* would any constitutional question
arise on that prohibition, or could they claim admission, as matter
of right under the constitution? The answer is obvious. The
corporation has that right of exclusion; and so has the state.
Should the trustees of the *Plainfield Academy* pass an order
that in future, no student from the state of *Rhode-Island*
should be admitted, is that a violation of the constitution of the
*United States ?* Surely not. The state created these corpo-
rations, and could not impart to them power it did not itself
possess.

2. That these pupils are not "*citizens*" within the 2nd sect. of the 4th art. of the constitution of the *United States*, and as such entitled to all the privileges and immunities of citizens of the several states.

In deciding this question, every thing must depend upon the rules of construction, established by the common law. These rules are well understood, and as established in ages gone by, they will now be of infinite service in guiding to a correct result.

1st. The *intention* of the enacting power is to be sought for.

2d. The whole instrument or *act* must be taken together, so that its parts may be consistent with the whole. And

3d. The period of time when the enactment was made, embracing the language then in use, and the circumstances of the country, enter into the construction of the instrument and indicate its meaning.

In the administration of justice upon a *contract*, a deed or a will, we go back to the period when the contract was made—the condition of the parties at the time when the deed was sealed—and all accompanying circumstances, are taken into the account, to learn the extent of the obligation. In construing a legislative act, of a hundred years standing, the court is not to be governed by the circumstances of the present day. To do so, would be to pervert, and not to construe. With these rules, we come to this question,

What *was* the *intention* of those who framed the constitution ? Did they mean to place persons of colour on the footing of equality with themselves, and did they mean to make them *citizens ?*

In answering this question, it matters little what may be the opinion of a few madmen or enthusiasts now, but what was the intention of the people of the *United States, at the time* when the constitution was adopted. Any *term*, like the term *inhabitant,* may be used in various senses. That term sometimes means a simple resident, or dweller, but when used in another sense, it means one who may have gained a settlement—one who has removed from another state, and complied with all the requirements of our statute to constitute him a *legal inhabitant.* This is the technical use of that term. So also with the word *citizen.* That term may be used in diverse ways, and convey to the mind diverse meanings. It is quite immaterial

*Windham,*
July, 1834.

Crandall
*vs*
The State.

how it may have been used in loose debate—in speeches—or in letters ; but the question really is, how was it used in the constitution ?   What was its meaning *then*, and for what purpose was it used there ?   Before this question can be properly answered, we may be allowed to enquire also, what was then meant by the term "*immunity,*" or "*privilege ?*"   Privilege then, as now, signified "*any particular benefit, advantage, right or immunity not common to others of the human race.*"

"Immunity," as there used, is synonimous with privilege, so that *the* privileges and immunities to be enjoyed by *these citizens*, was something over and above what all the human race could enjoy.   We must now advert to the condition of the country, and the circumstances of the human race, then upon the face of this country.   The white men and the coloured men composed the grand divisions of the human family.   The *white* men then were entitled to particular privileges, above the coloured men : civil and political rights belonged, by the laws of all the states, to the former, but not to the latter.   The coloured men were either natives, called *Indians*, or of *African* descent, called *Negroes*.   From the *Indians* this whole country had but recently been conquered ; and as in many of the states, they were still very numerous, it cannot even be pretended, that *Indians* were embraced in the term *citizen*.   The *African* race, as a body, were then *slaves*, and held in bondage, by those who made the constitution.   It was then deemed fit and proper to hold slaves.   All the states in the Union were slave states, and their laws tolerated slavery.   *Massachusetts* and *Connecticut* had passed laws that coloured persons born after a certain period should be free at 25, but they still held slaves.   And can it be entertained for one moment, that those who framed the constitution should hold one portion of *a race of men* in bondage, while the other portion were made *citizens ?*   This would be strange inconsistency.   Go back to the time when the constitution was made, and enquire after the condition of the country, and take into consideration all its circumstances, and all difficulties will be out of the way.   *Then* it was not immoral to hold slaves.   The *best men* bought and sold negroes, without a scruple.   This impulse is of modern date ; and however creditable to the heart, cannot alter the *constitution*.   The immortal *Washington*, who presided at

*Windham,*
*July, 1834.*

*Crandall*
*v.*
*The State.*

the convention, and who subscribed the instrument, under the laws of *Virginia* held more than one hundred slaves, as his property, on that day ; and he was not thus inconsistent.   He never intended to have you say, that the portion of the human race which were held in bondage were slaves, and the residue of that same colour were *citizens.*   This position is supported by the fact, that in the same article of the constitution, slavery is recognized.   The 3d clause of the same section, is as follows : " No *person* held to service or labour, in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service, but shall be delivered up, on claim of the party, to whom such service or labour may be due."   Although the term " slave" is not used in this clause, yet its meaning is perfectly obvious. It is as plain to our understandings, as if it had been written, " No slave owned by any person in one state, escaping to any other state, shall, &c."   The term " slave," also, would carry with it the inseparable distinction of colour.   If *birth* alone gives *citizenship*, why is not this *slave* a *citizen ?*   Because the terms are contradictory.   These slaves are called " persons" in the constitution, and the white men are citizens.   So that if we regard at all, the *whole instrument*, as we are bound to do, by the rules of construction, we must reject the use of the term *citizen*, when applied to the coloured race.

The counsel for the plaintiff in error insist, " that the *distinction of colour is novel, inconvenient and impracticable.*" The position thus assumed will embrace *Indians*, and if we add to this another proposition laid down in the defence, that *birth* and not *colour* constitutes citizenship, the *Indians* are surely embraced.   Can it be seriously contended, that the constitution does secure to *Indians* the right of citizens ?   Practically, it has never been so.   When the constitution was adopted, this country had but recently emerged from the *Indian* wars. These wars were wars of conquest ; and the white men had driven the red men from their lands, and acquired a title to those lands, by conquest and by force ; and do you believe, that so soon, these conquered individuals would all be made *citizens ?*   There is another fact, which would repel this idea. In several of the states, when the constitution was adopted, there were more *Indians* than *white men ;* and if citizens, the *Indians* would have had the supremacy.   We need not go

abroad for evidence on this point in the case. *Connecticut* has ever had within its limits numerous *Indians*, both tribes, and others not belonging to tribes; and whoever saw one of these *Indians* under our own laws, before or since the revolution, enjoying *one civil* or *political* privilege? If citizenship be a matter of favour, then surely the *Indian* stands far above the *African.* This is the *Indian's* home—it was once his soil, but it has passed into other hands. It is now the white man's country; and the white man is an *American* citizen.

Chancellor *Kent* adds his high authority to what has been said: "It is the declared law of *New-York,* that *Indians* are not citizens, but distinct tribes, being under the protection of government, and consequently, never can be made citizens under the act of Congress." 2 *Kent's Com.* 72. 2nd ed.

The distinction of colour, so far from being novel, is marked, in numerous ways, in our political system.

The *first Congress* after the constitution was adopted, was composed of many of those distinguished patriots, who framed the constitution, and from that circumstance would be supposed to know what its spirit was. Some of the earliest work they performed for the country, was to establish by law a uniform rule of naturalization. The first law regarding naturalization was passed by Congress in 1790, and in it this precise and technical language is used: "Any alien, being a *free white person,* may become a *citizen,* by complying with the requisites hereinafter named." In the year 1795, a further regulation was made by law, when the same language is used: "Any *free white* person may become a citizen," &c. In 1798—1802—1813, and 1824, similar laws were passed, on the same subject, and in each of those laws, the same technical language is used. These laws were carrying into effect the constitution itself; and if the constitution in any part of it embraced coloured persons as citizens, then Congress mistook its duty, and early departed from its provisions. Congress have also marked this distinction of colour in the post-office laws. "No person of colour can be engaged in the post-office, or in the transportation of the mail." This is a right open to all but persons of colour. Chancellor *Kent* settles this question beyond cavil: "The act of Congress confines the description of aliens capable of naturalization to 'free white persons.' I presume that

*Windham,*
July, 1834.

Crandall
*v.*
The State.

*Windham,*
*July, 1834.*

*Crandall*
*v.*
*The State.*

this excludes the inhabitants of *Africa* and their descendants ; and it may become a question, to what extent persons of mixed blood, as mulattoes, are excluded, and what shades or degrees of mixture of colour disqualify an alien from application for the benefits of the act of naturalization. Perhaps there might be difficulties as to the copper-coloured natives of *America,* or the yellow or tawny race of *Asiatics,* though I should doubt whether any of those were 'white persons,' within the purview of the law." 2 *Kent's Com.* 72. 2nd ed.

Again : " In most of the United States, there is a distinction, in respect to political privileges, between free white persons and free coloured persons of *African* blood ; and in no part of the country do the latter, in point of fact, participate equally with the whites, in the exercise of civil and political rights. The *African* race are essentially a degraded caste, of inferior rank and condition in society. Marriages are forbidden between them and whites, in some of the states, and when not absolutely contrary to law, they are revolting, and regarded as an offence against public decorum. By the revised statutes of *Illinois,* published in 1829, marriages between whites and negroes, or mulattoes, are declared void, and the persons so married are liable to be whipped, fined and imprisoned. By an old statute of *Massachusetts,* of 1705, such marriages were declared void, and are so still. A similar statute provision exists in *Virginia* and *North-Carolina.* Such connexions in *France* and *Germany,* constitute the degraded state of concubinage, which is known in the civil law. But they are not legal marriages, because the parties want that equality of state or condition, which is essential to the contract." 2 *Kent's Com.* 258. n. 2nd ed.

This distinguished author was in active life when the constitution was framed, and knows its import, and has emphatically told us, that there ever has been, and still is, this distinction of colour.—To show that this is not " novel," we may refer to the constitutional provisions of many of the states. To begin with the constitution of our own state, we shall find this distinction of colour is kept up throughout that instrument. No person can be elected to the office of govern or, lieutenant-governor, or representative, unless he be an *elector,* and none other than *white* male *citizens* can be made electors. These are the explicit provisions of the constitution of *Connecticut,*

and now one branch of the government is solemnly called on to disregard the distinction of colour !

Let us mark the provisions of the constitutions of other states. In *Delaware*—in all elections, none but free *white* male citizens can vote. In *Maryland*—Every free *white* male citizen shall vote. In *Virginia*—" Every *white* male citizen of the commonwealth, resident therein, shall vote." In *South-Carolina* " Every free *white* man may vote." In *Ohio*—" All *white* male inhabitants shall vote." In *Louisiana*—" Every free *white* male citizen of the *United States*" shall have right to vote. In *Mississippi*—" Every free *white* male person shall have right to vote." In *Illinois*—" All *white* male inhabitants, resident, have right to vote." In *Alabama*—" Every *white* male person shall vote." *Indiana*—" Every *white* male citizen of the *United States,* may vote." *Rhode-Island* has defined the qualifications of *freemen,* and among these qualifications, a man must be *white,* in order to enjoy the elective franchise. In all these states, constitutional provisions forever cut off the coloured man from the enjoyment of the " immunity" of voting for his rulers. By the constitution of the state of *New-York,* a singular disqualification exists. All white men who go into that state, can vote, after a residence of six months, but the coloured man must have resided there three years, and possess, free from incumbrance, real estate to the value of 250 dollars.

But it is said, in relation to coloured persons, that the constitution denominates them citizens : but a simple reading of the article will evince, that this term *there* signifies only the same as *residence.* It is used as synonimous with " inhabitant" and " resident." All these constitutional provisions relate to the right of suffrage. These provisions exclude the black man from the enjoyment of this privilege ; and this evidence is so strong that the counsel for the plaintiff in error are obliged to assume the ground, that this *elective franchise* is not an *immunity* or *privilege !*

This is, indeed, the legitimate consequence of the whole argument ; but is it true, that the right of suffrage is not a privilege ? The whole structure of our government contradicts this proposition. We are distinguished from other nations, by this right of *electing our rulers.* It is the highest privilege which freemen can enjoy ; it is an immunity at the very foundation

of a republican government.   Why was the revolution set in motion?  Why was the declaration of independence subscribed by those immortal patriots?   Because the people said, that *taxation* and *representation* should go together.   This right of suffrage was denied, as a right, and the flames of the revolution burst forth, and taught those who denied the right, that it was one which freemen should enjoy.   Take away this right, and American liberty will cease.   It is an *immunity* which belongs to these states—one which they never will give up.   It belongs to them as citizens, and as it has been denied to the coloured race generally, it is evidence, that that race were not embraced by the framers of the constitution, in the term citizen.   Were the aid of a judicial decision needed on this point, it may be found in the opinion of Judge *Washington,* in the case of *Corfield* v. *Coryell,* 4 *Wash. C. C. Rep.* 371.   He says, in that case, that " the elective franchise is a fundamental privilege, secured by this article of the constitution."   We have, therefore, the authority of Chancellor *Kent* and Judge *Washington,* the laws of congress and the constitutions of the several states in opposition to the extraordinary proposition advanced by the opposing counsel.

There is another part of their argument, which may require an answer.   It is claimed, that all such state laws as may authorize the removal of paupers from one state, to that to which they belong, is an infringement of the constitution.   A citizen of one state, although a *pauper,* may come here, and it is not in our power to remove him to his home.   This doctrine, if true, would overturn half our state legislation.   It would put down, as unconstitutional, our statute, which directs that persons coming from another state, may be warned out, and if they refuse, may be removed.   It is said, this is an old law, and is now invalid.   It will be recollected, that since the adoption of our state constitution, this law has been revised and re-enacted.   In 1821, when the late eminent Chief Justice revised the Statutes, under the constitution, it did not occur to him, that it was unconstitutional.   This is new doctrine, indeed, and would be the result of a constitution wholly novel.   Other states have a deep interest in this question.   There is not a state in *New-England,* nor in the Union, but have laws of this character.   These laws are made in self-defence—to preserve the state from the overwhelming effects of a bad population

*Windham*,
July, 1834.

Crandall
*v.*
The State.

a ndfrom pauperism.   These must all be swept from the statute books, and the states must undo, what it has long been their policy to do.   It is truly a startling doctrine, and would sweep into one general vortex all the state sovereignties.

When these states formed a union, it never occurred to the people that all state legislation—all police laws—all pauper laws—and all education laws, were abrogated; and it cannot be apprehended that this court will sanction such claims.   The practical construction of the article in question will justify no such decision.   There are, indeed, numerous other distinctions made by *state legislation*, between persons who are legal inhabitants of one state, and those coming into that state from another.   If the position assumed on the other side be correct, then all these distinctions are invalid, and should be done away.   They are infractions of the constitution, according to the claim set up; but according to the practical construction given to the constitution, they are good and wholesome laws. They are laws which never will be altered or repealed, until the state governments are wholly abandoned—until they are merged in the general government.   It may be proper to notice some of these distinctions, resting not on colour, but on inhabitancy or mere residence.   The statute law of this state, (title Inhabitants,) provides that no person not an *inhabitant* of this state, shall be *entertained* or hired, unless he shall give security to the select-men, to save the town from expense.   No person shall let any tenement to any such foreigner, unless such bonds of indemnity shall be given.   No person shall 'bring into this State, any poor and indigent person, under the penalty of sixty-seven dollars.'   Inhabitants of other states, at the discretion of the civil authority, may be removed from this state, by warrant.   Suppose these laws are unconstitutional, then any town in this state may, against the wishes of its inhabitants, be overrun with a bad population, or filled with paupers !   This is a result to which the people never can be driven.   It is a condition never before contemplated, 'novel, inconvenient and impracticable.'   Among the distinctions of this class, many may be found in the constitutions of the states. In the constitution of Maine, all *students* from other states are prohibited the right of suffrage in the town where the college or seminary is situated.   And all officers in the military, naval, or marine service of the United States are likewise prohibited

from voting, when from another state, while one who belongs to that state may vote, and all others, with three months residence, may vote. By the same constitution, no person can be a representative unless he shall have resided in the state one year, after he shall be 21; but an inhabitant of the state may vote in one day.

By the constitution of *Massachusetts*, a citizen of *Connecticut* removing there, must be a resident of that state five years, before he can be elected a senator. To be elected a representative, and to become an elector of that state, he must have resided therein one year. To be elected governor or lieutenant-governor, he must have resided there seven years. Not so with one who is an inhabitant of that state.

By the constitution of *New-Hampshire*, a citizen of *Connecticut* removing there, must reside in that state seven years, before he can be eligible to the office of governor or senator, while there is no such restriction upon the citizens of that state. A similar distinction in the constitution of *Vermont* may be found, differing only in the length of time.

By the constitution of *New-York*, a citizen of that state may be elected governor, while a citizen of any other state, going there to reside, must have resided there five years.

By the constitution of *Pennsylvania*, a person to be a representative, must reside in that state three years next before the election. The governor must have been an inhabitant of that state seven years, and electors must have resided in that state two years; but their own native citizens or inhabitants have no such restrictions placed upon them.

In *Delaware*, when any person removes there from another state, he cannot enjoy the right of voting, until he has resided in the state two years—he cannot be a senator until he shall have resided there three years—nor governor until he shall have resided there six years. Similar restrictions are imposed, by the constitution of every state in the union; but it is not necessary to detain the court longer with this class of restrictions. They are applied invariably to persons who go from one state to another; and if the position assumed on this defence be correct, then all these constitutions should be re-modelled. These provisions are void! There can be no method of escape, except that which has been found, that the elective franchise is not a fundamental privilege!

In relation to these various restrictions, we have a judicial decision of high authority, the case before referred to, of *Corfield* v. *Coryell*, 4 *Wash. C. C. Rep.* 371. It is in principle exactly similar to the one on trial. The counsel in *that* case, made the same argument that is here made—they urged an infringement of the 4th article; but the learned Judge denied that claim. *Judge Washington* lived when the constitution was adopted—he had imbibed its true spirit; and when called upon to construe its provisions, he gave harmony to the whole, while at the same time he preserves the state governments. His language is emphatic : " *These fundamental rights are secured to the citizens, subject, nevertheless, to such restraints as the government may justly prescribe for the general good of the whole.*"

So we may say with equal propriety, and equal force, in this case, that the 'privileges and immunities' of education shall be subject to such restraints as the government may justly prescribe, for the general good of the whole. And who will not say it is for the general good of the whole, to have all schools, academies and colleges, under the superintendence of some board of visiters, that the good ends of education may not be lost? Who will not say, that these states must regulate education, or it never can be regulated? Who will not say, that the whole system of education does not rest with the states? Who will not say, that a state police, and the whole system of pauper laws, do not remain with the state governments? Who will say, that Judge *Washington* was wrong in declaring that these fundamental privileges, whatever they may be, must be subject to restraints for the general good of the whole? May we not, under this wise decision, preserve our constitutions—our pauper laws—our police laws, and our school laws? Yes, we may exclude from our state a bad population;—we may provide that pauperism shall not overwhelm the state; and we may provide for its safety, in doing so.

WILLIAMS, J. The errors assigned in this case, are, that the superior court had no jurisdiction, and that the information is insufficient.

The first question has not been argued; but as it is directly presented, the court must be satisfied that the superior court had jurisdiction; if not, we need proceed no further.

*Windham,*
*July, 1834.*

Crandall
*v.*
The State.

The 122nd section of the act concerning crimes, passed in 1830, gives jurisdiction to the county and superior courts in criminal cases.   By that act, jurisdiction is given to the county court of all offences of which the superior court has *not* sole jurisdiction, not within the jurisdiction of justices of peace.

That the county court has jurisdiction cannot be denied ; but the enquiry is, has the superior court also jurisdiction ?

The same section provides, that the superior court shall have jurisdiction, except where the act creating a particular offence confers jurisdiction upon a particular court.   That this is an offence originally cognisable by the county court, and that the statute on which this information is founded, does not confer jurisdiction upon any particular court, cannot be denied.   Of course, it must be one of the cases in which the superior and county court have concurrent jurisdiction.

The other point presented, is, that the information is insufficient ; and this has been argued on the ground, that this law is contrary to the constitution of the *United States*.

That question is one of the deepest interest to this community, involving the rights of a large and increasing population, and the correct construction of a clause in the constitution as to the privilege of citizens of the several states in other states, and who compose that class called *citizens*.

When the nature and importance of these questions are considered, the difficulties actually attending the construction of this clause of the constitution, the magnitude of the interests at stake, the excitement which always attends the agitation of questions connected with the interests of one class, and the liberties of another, more particularly at the present time ; the jealousies existing on the one hand, and the expectations excited on the other ; no desire is felt to agitate the subject unnecessarily.   In addition to which, the respect that is due from one branch of the government of this state to another, while it would never deter me from expressing, when necessary, an opinion against the constitutionality of a law, would always lead me to decline an expression on the subject, in a case not requiring such a decision.   If then it appears, that the same result must follow, if we do not examine at all this constitutional question, which has been argued with so much ability,

as if it was decided, for one, I feel no disposition to volunteer an opinion on that subject.

And on examination of this information, it seems to me, that no crime is charged upon this defendant, even if this law is constitutional.

The act provides : " That no person shall set up or establish any school, academy or literary institution for the instruction and education of coloured persons, who are not inhabitants of this state ; nor instruct or teach in any school, academy or literary institution whatsoever, within this state ; or harbour or board, for the purpose of attending or being taught or instructed in any such school, academy or literary institution, any coloured person, who is not an inhabitant of any town in this state, without consent in writing first obtained of a majority of the civil authority, and also of the select-men of the town in which such school, academy or literary institution is situated :" Provided that nothing therein shall extend to any district school, incorporated academy, &c.

This information charges *Prudence Crandall* with harbouring and boarding certain coloured persons, not inhabitants of any town in this state, for the purpose of attending and being taught and instructed in a school, set up and established in said town of *Canterbury*, for the instruction and education of certain coloured persons, not inhabitants of this state.

She is not charged with *setting up a school* contrary to law, not with *teaching* a school contrary to law ; but with harbouring and boarding coloured persons, not inhabitants of this state, without license, for the purpose of being instructed in such school.

It is, however, no where alleged, that the school was set up without license, or that the scholars were instructed by those who had no license.

If it is an offence within the statute to harbour or board such persons without license, under all circumstances, then this information is correct. But if the act, in the *description of the offence* itself, shows, that under some circumstances, it is no offence, then this information is defective.

The object in view of the legislature, as disclosed by the preamble, is to prevent injurious consequences resulting from the increase of the coloured population, by means of literary

*Windham,*
*July, 1834.*

Crandall
*v.*
The State.

institutions, attempted to be established for the instruction of that class of inhabitants of other states.

Such institutions and instructors teaching such scholars are prohibited, unless licensed, as are also persons from harbouring or boarding scholars of that description, without license.

From the first reading of the act, it might seem as if licenses must be obtained, by each of these classes; by those who set up the school, those who instruct in it, and those who board the pupils; but, it is believed, this cannot have been intended. The object professedly aimed at, is, to prevent the increase of this population, which, it is supposed, will take place, by allowing them free education and instruction; to prevent which it provides, 1st, That no person shall set up or establish any school, &c. for that purpose, without license: 2nd, That no one shall instruct in any school, &c. without license: and 3rd, That no one shall board or harbour such persons, so to be instructed *in any such school, &c.,* without license.

The object, evidently, is, to regulate the schools, not the boarding houses; the latter only as auxiliary to the former.

It is apparent, that when the school set up is legalized, or the instructor permitted to instruct, the school is an authorized institution, as much so as any public school of the state, as any district school or incorporated academy. It is as legal as it would have been, if this statute had not existed; because the same act which prohibits it without license, authorizes it to be licensed; and when that is obtained, the prohibition no longer exists. The scholars have as good a right to attend it as those of any cther school. And it cannot be supposed, that the legislature intended to make it criminal to provide for those thus licensed to attend; or that they meant to allow the select-men to license the school, and starve out the scholars; or that they intended to onerate them with the duty of licensing each institution, each instructor in the institution, and each boarding-house for each pupil of that institution. Such a construction would impose an obligation upon the authority as burdensome as it would be vexatious to the institution. Nor is it to be believed, that the legislature intended to exercise a supervision over the domestic concerns of families, as novel in this country as unnecessary; nor does the statute require such a construction.

After prohibiting the establishing of schools of a certain

description, without license, or instructing these persons with- *Windham, July, 1834.*
out license, it prohibits harbouring or boarding these coloured
persons for the *purpose of being taught or instructed "in* Crandall *v.* The State.
*such schools,"* without license, &c.

What is meant by the term *such schools ?*    The prohibited
schools.    What schools are so prohibited ?    Schools for the ed-
ucation of coloured persons not inhabitants of this state, and
*not licensed* by the civil authority and select-men of the town.
And those who board or harbour the scholars of *such schools*,
are subject to a like penalty, unless they are licensed.

It is the *unlicensed* schools which are the objects of this su-
pervision ; and these only are the schools forbidden.    They
only are guilty, who assist in such prohibited institutions, or
harbour or board their pupils.    To bring the case, then, within
the act, the school must be for the education or instruction of
people of colour, not inhabitants of this state, and a school set
up or established without license ; or in case of other schools,
the instructors of this class must be licensed.    Those who
board or harbour the scholars of such schools or such instruc-
tors, and those only, are criminal, unless they themselves have
a license.

This information charges, that this school was set up in
*Canterbury*, for the purpose of educating these persons of co-
lour, not inhabitants of this state, that they might be instructed
and educated ; but omits to state, that it was not licensed.
This omission is a fatal defect ; as in an information on a pe-
nal statute, the prosecutor must set forth every fact that is ne-
cessary to bring the case within the statute ; and every excep-
tion within the enacting clause of the act, descriptive of the
offence, must be negated.

Thus, where it was made penal to impress in the *West-In-
dies* a mariner in the *British* sugar colonies, by any officer of
a ship of war, *unless he should have before deserted from
such ship of war*, it was held, in a suit for the penalty, that
it must be alleged, that the persons impressed had not deserted
such ship of war.    And *Buller*, J. says, he knew of no case
for a penalty on a statute, where there is an exception in the
enacting clause, that the plaintiff must not show that the party
whom he sues, is not within it.    *Spieres* v. *Parker*, 1 *Term
Rep.* 141—145.    And in an action on a statute, enacting, that
no innholder shall, on the *Sabbath*, entertain any person not a

HARWARD LAW LIBRARY

Windham,
July, 1834.

Crandall
v.
The State.

traveller, &c., an information omitting to state that the person entertained was not a traveller, was held insufficient.  *The Commonwealth* v. *Maxwell*, 2 *Pick.* 141.

So, in an action for a penalty against an executor for not proving a will within thirty days, a declaration, which omitted to allege, that it was without just excuse made and accepted by the court of probate for such delay, was held to be insufficient.  *Smith* v. *Morse*, 6 *Greenl.* 274.  And that a verdict does not cure such a defect, is proved by the first and last of the above cited cases; the exception being, in each of them, taken after verdict.  This information, therefore, is insufficient.

And in coming to this result, no opinion is given relative to a question which might arise, whether the proviso relative to public schools at the close of the enacting clause, ought to have been negated.

Different opinions seem to have been given in relation to this subject; and it is only noted here, to show, that it did not escape the attention of the court.

Being of opinion that the information is insufficient on this ground, it would seem that the judgment must of course be reversed.  But as it is a rule of this court, that in every writ or motion in error, there shall be a special assignment of errors, and the court will hear no other; (6 *Conn. Rep.* 427.) and as this writ, though it avers that this information is insufficient, points out only two causes of error, of which this is not one, it becomes important to enquire, what is the construction of that rule?  Is this an error assigned within that rule?  The object of this rule was to apprize the opposite party of the particular questions intended to be raised upon the writ of error; not of the *arguments*, but of the *points* to be argued.

The benefit of this would be almost lost, if under a general assignment of insufficiency of the declaration, the plaintiff in error might assign particular causes, and then rely upon other exceptions; it would rather tend to lead the opposite party from the real point of difficulty to examine other questions, as the case might be, of less difficulty.  The rule might thus be made use of as a means to divert the defendant in error, rather than to present to him the real objection.  Such a construction is not admissible.

This is not, then, so assigned, that the plaintiff in error can be *heard* upon it.  What then shall be done?  Shall the court

render judgment, and that too in a criminal case, that the information is sufficient, when, upon inspection, they are clearly of opinion that it is insufficient ? If the rule require this, it ought to be abolished without delay, as tending to place the court in a position which might be most embarrassing.

Suppose in a capital case, a writ of error was brought, alleging that the indictment was insufficient ; and the court found it sufficient; but on looking at the record, discovered some other fatal defect : could it be their duty to affirm that judgment, and send the prisoner to execution ? The rule admits of a construction which will effectuate its object, and yet not cripple the court. The plaintiff shall not be heard to allege any cause he has not assigned. This will be a sufficient inducement for him to point out every cause on which he relies. At the same time, if the court should see or believe, that some other defect existed, the rule would not prevent them from calling on the defendant in error to remove the objection, which had occurred to them, nor the court from deciding upon the objection, if it could not be obviated.

Such a construction of the rule, is entirely analogous to that which has long been adopted in the superior court, and has been found perfectly satisfactory. There is a rule, that no motion in arrest shall be allowed, (or heard) unless made within twenty-four hours after verdict. But if no such motion is made, did the court ever hesitate to arrest a judgment, if they discovered that the declaration was insufficient, or the record was so fatally defective, that any judgment upon it must be reversed ?

If this practice is correct, it seems to me more important to adopt it in this court, from which there cannot (except in a particular case) be any appeal.

Such a construction is also supported, by the principles of a case recently decided in the court of *King's Bench ;* where a writ of error was brought for error in fact. On the trial, errors in law were discovered ; and although it is a well settled rule, that errors in law and fact cannot be united in one writ, yet the court held, that it was their duty, *ex officio,* to look through the record, and to reverse the judgment, for those errors which could not, by the settled rules of proceedings, be assigned in that writ as a ground of error. *Castledine* v. *Mundy,* 4 *Barn & Adol.* 90. (24 *Serg. & Lowb.* 30.)

HARVARD LAW LIBRARY

*Windham,*
*July, 1834.*

Crandall
*v.*
The State.

The result, therefore, to which I have arrived, is, that there is error in the judgment complained of.

BISSELL and CHURCH, Js. were of the same opinion.

DAGGETT, Ch. J. had no doubt that the information was insufficient, for want of an averment that the school was not licensed; but as this had not been assigned as cause of error, he was of opinion, that the Court were precluded, by the rule of 1826, from regarding it as such; and consequently, that the judgment could not be reversed on that ground.

PETERS, J. was not present.

Judgment reversed.